# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

     vs.                           Cr. No. 07-380

**WAYLON JIM,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the *United States Motion in Limine for Daubert Ruling Regarding the Admissibility and Scope of Defendant's Proposed Expert Testimony* [Doc. 62], filed February 27, 2008.  The Court held a hearing on the motion on March 13, 2008.  Having reviewed the parties' submissions, the relevant law, the arguments and evidence presented at the motions hearing, and being otherwise fully advised in the premises, the Court grants in part and otherwise defers its ruling on the motion for the reasons set forth more fully below.

## I. BACKGROUND

In the early morning hours of September 1, 2006, Defendant Waylon Jim was driving a car that rolled over in a single-vehicle accident, killing passengers Jameson Toledo and Regis Sandoval.  The Defendant and passenger Jonah Sandoval survived.  After the rollover, the Defendant was taken to an Indian Health Services hospital emergency department where, approximately four hours after the accident, his blood was drawn for the purpose of

screening for alcohol and other mind-impairing substances. The Defendant's blood-alcohol concentration ("BAC") measured 112 mg/dl (approximately 0.095 g/dL), which is above the legal limit for operating a motor vehicle.

In connection with the deaths of his passengers, the Defendant has been charged in a Superseding Indictment with four counts of involuntary manslaughter in Indian Country (the unlawful killing of Regis Sandoval while operating a motor vehicle while under the influence of alcohol; the unlawful killing of Regis Sandoval while operating a motor vehicle without due caution and with a wanton and reckless disregard for human life [Counts 1 and 2]; and the same two charges with respect to Jameson Toledo [Counts 3 and 4]).

Among the pretrial motions filed by the parties was one in which the Government challenged the admissibility and scope of the testimony of proposed expert defense witness, Edward Reyes, and sought a <u>Daubert</u>[1] hearing on same. Dr. Reyes has been offered to testify that the Defendant's BAC at the time of the rollover cannot be determined with certainty. The basis of the Government's objection is that Dr. Reyes, who is not a forensic toxicologist but, instead, a pharmacologist, has arrived at conclusions that are outside his area of expertise and beyond the scope of admissible expert testimony. In response, the Defendant calls Dr. Reyes "supremely qualified to testify on the subject of pharmacology in general and pharmacokinetics, in particular, especially as the subject matter pertains to alcohol distribution[;]" and asserts that a lack of certainty as to the Defendant's blood alcohol content at the time of the accident is relevant. [Doc. 65 at 1-2]

---

[1] <u>Daubert v. Merrell-Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).

## II. ANALYSIS

Rule 702 of the Federal Rules of Evidence imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000).  As part of its gatekeeping function, and in addition to determining whether the proposed expert is qualified to offer an opinion, the Court must also determine whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  Reliability under Daubert is determined by looking at whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue.  Smith v. Sears

3

Roebuck and Co., 232 Fed.Appx. 780, 781 (10th Cir. 2007).

The Court concludes that Dr. Reyes qualifies as an expert in the fields of pharmacology and pharmacokinetics. He testified at the hearing—and his curriculum vitae[2] demonstrates that—he bears the title of Professor Emeritus, Department of Biochemistry & Molecular Biology at the University of New Mexico School of Medicine. He holds a Bachelors of Science degree in Pharmacy from the University of New Mexico, a Masters of Science degree in Pharmacology from the University of Colorado, and a Ph.D. in Pharmacology from the University of Colorado. He is the author of numerous publications dealing with pharmacology, and has been qualified as an expert in both State and Federal court.

Notwithstanding Dr. Reyes's expert qualifications, the evidence presented and the proffer put forth at the Daubert hearing are insufficient for the Court to permit Dr. Reyes to testify in this matter as an expert. This is because part of Dr. Reyes's proposed testimony is based on insufficient facts and data and is not the product of reliable principles and methods, and none of the principles or methods upon which he relies have thus far been applied to the facts of the case. See Smith, 232 Fed.Appx. at 781. The Court explains.

Dr. Reyes testified at the Daubert hearing that it is not possible to know with precision the Defendant's BAC at the time of the accident based upon the fact that his BAC from a

---

[2] Although only a sampling of Dr. Reyes's accomplishments are listed here, his full curriculum vitae, which was tendered to the Court as an exhibit during the Daubert hearing, was considered by the Court pursuant to its special gatekeeping function. [See Doc. 93; Exh. 2, Def. Exh. U].

blood draw four hours later was 0.095 g/dL.  According to Dr. Reyes, it is impossible to know whether the Defendant's BAC at the time of the draw was in the absorption, peak, or elimination phase.  Dr. Reyes further testified that the absorption phase can be delayed by the release of adrenaline, and that an individual's BAC can be compromised by the infusion of intravenous fluids.  Additional factors to consider, according to Dr. Reyes, would also be whether the Defendant was in a "fasting" or "non-fasting" state at the time of the accident, and his tolerance, historically, for alcohol.

With respect to Dr. Reyes' testimony that an individual's BAC can be affected by the release of adrenaline, shock, and/or the infusion of intravenous fluids, the Court concludes that this testimony is neither based upon sufficient facts and data, nor is it the product of reliable principles or methods.  See Smith, 232 Fed.Appx. at 781. Rather, Dr. Reyes's testimony regarding the effects of adrenaline and shock is most generously described as speculative, as the study[3] upon which he relied lists anticholinergic agents (of which adrenaline is one) as one of "many of the variable factors that *might* lead to fast or slow absorption of ethanol." [See Doc. 93; Exh. 2, Govt. Exh. 106 (emphasis added)].  Dr. Reyes further testified that he did not know how this study was conducted.  Similarly, Dr. Reyes's testimony as to the effect upon BAC of the infusion of intravenous fluids was based upon a study titled *Analysis for Alcohol in Postmortem Specimens*, which, to the extent it even discusses ante-mortem blood dilution, states that "[a]n injured subject receiving transfusions

_____

[3] Dr. Reyes testified that he was asked by the Government to provide only one study as to the effects of adrenaline on alcohol absorption; he explained, however, that more studies on the subject exist.

of blood fluids *may* have a diluted blood sample. . . ." [See id.; Exh. 2, Govt. Exh. 107 at 164 (emphasis added)].[4]

Even assuming that the Court were able to conclude that Dr. Reyes's testimony regarding the effect upon BAC of adrenaline, shock, and the infusion of intravenous fluids was based upon sufficient facts and data and was the product of reliable principles or methods, see Smith, 232 Fed.Appx. at 781, Dr. Reyes failed to show how these factors applied to the particular circumstances of this case, because he testified that he lacked knowledge of the particular facts of this case as those facts bear on these factors.  For example, when asked if the Defendant here experienced an adrenaline release or shock, Dr. Reyes responded that he did not know.  He also stated that he did not know if adrenaline affected the alcohol absorption in the Defendant's stomach.  Although Dr. Reyes explained the study showing that the infusion of intravenous fluids might compromise a blood sample, he was unable to testify with any certainty as to whether the Defendant here had received such an infusion.[5]

Dr. Reyes also testified as to his determination that it can take up to six hours for an

_____

[4] Dr. Reyes also relied upon studies examining fetal alcohol syndrome in mice and rats. He admitted, however, that those studies, even to the extent they measured the reflexes of the mice and rats analyzed, do not relate directly to the measure of human reflexes once alcohol has been consumed.  Nor was there any testimony as to how studies of pregnant mice and rats relate to the effects of alcohol on a man with the Defendant's physical attributes.

[5] This lack of certainty was consistent with the conclusions memorialized in Dr. Reyes's letter of November 8, 2007 to counsel for the Defendant, in which Dr. Reyes stated that "[i]t is not clear as to what medical treatment was provided to Mr. Jim while on route to the hospital[,]" and also that the Defendant's "blood sample *may* have been compromised by medical treatment in the ambulance." [Doc. 93; Exh. 2, Govt. Exh. 101].

individual's BAC to reach peak levels, and that the amount of food in a subject's stomach, as well as his tolerance for alcohol, may affect the speed at which BAC peaks.  The Court concludes that Dr. Reyes's testimony on these topics was indeed based upon sufficient facts and data and was the product of reliable principles and methods.  Nevertheless, Dr. Reyes did not demonstrate that he applied these principles and methods to the facts of the instant case.  See Smith, 232 Fed.Appx. at 781.  For example, the study upon which Dr. Reyes relied for his conclusions involved "non-fasting" individuals, or individuals whose stomachs were full of food.  When questioned as to whether the Defendant here had anything in his stomach at the relevant times, Dr. Reyes replied that he believed he had read in a deposition that the Defendant had stopped the night of the accident and picked up some beef jerky.[6]  Moreover, Dr. Reyes, who never interviewed the Defendant here, testified that, because he "do[es]n't know how much [the Defendant] drinks normally," [Transcript of March 13, 2008 hearing], he cannot assess the Defendant's tolerance for alcohol.

Finally, particularly instructive to the Court's decision is the following colloquy, which took place between Dr. Reyes and counsel for the United States:

> Q:   Did you ever attempt to calculate Mr. Jim's BAC at the time of the rollover?
> A:   Yes I did.
> Q:   What did you come up with?
> A:   I don't have my figures here with me.
> Q:   That's pretty important to bring along with you doctor.
> A:   For a trial it would be.  I didn't think this was going to be for me to go over the facts of what I calculated.  I didn't

---

[6]  Assuming without deciding that the Defendant bought the beef jerky in question, Dr. Reyes did not testify that the Defendant actually consumed it.

7

> bring them with me.
>
> Q:    You don't remember the number you reached?
>
> A:    I don't remember
>
> Q:    Why wouldn't you include that in the report that you provided to the United States?
>
> A:    Because I think what I used was numbers saying that he was—that I couldn't tell with an absolute certainty what his BAC would have been four hours earlier.
>
> Q:    Didn't you say, doctor, earlier that any scientist worth his salt will uses ranges all the time?
>
> A:    I did.  And that's why I'm saying that I couldn't come up with an exact number on that ***and I probably could give you a range if you give me some facts of this case***.

[Transc. of March 13, 2008 hearing (emphasis added)].  It is for these reasons that the Court is not persuaded that, at least thus far, Dr. Reyes has applied the principles and methods upon which he relies and that he cites reliably to the facts of this case.  His proposed testimony would thus not be relevant because his reasoning and methodology have not been applied to the facts of this case.

## III. CONCLUSION

For the reasons stated, the Court concludes that, although Dr. Reyes qualifies as an expert in the fields of pharmacology and pharmacokinetics, his testimony with respect to the effects upon blood alcohol concentration of adrenaline, shock, and/or the infusion of intravenous fluids is not sufficiently reliable to permit his testimony on those topics, since the proffered testimony is not is based on sufficient facts and data and is not the product of reliable principles and methods.  See Smith, 232 Fed.Appx. at 781.  As discussed more fully above, however, the Court reaches the opposite conclusion with respect to Dr. Reyes's proffered testimony on the topics of food in the stomach and historic tolerance for alcohol.

At this point, though, Dr. Reyes's proposed testimony cannot be deemed relevant because he has not shown how the principles and methods upon which he relies apply to the facts of this case. Accordingly, Dr. Reyes may not testify as an expert here unless he can eventually connect his conclusions to the facts of this case, and then only with respect to the effect that food and tolerance for alcohol had on the Defendant's BAC. As always, this pretrial evidentiary ruling is subject to reconsideration in the event that unforeseen circumstances or a change in context should arise during the trial.

**IT IS, THEREFORE, ORDERED** that the *United States Motion in Limine for Daubert Ruling Regarding the Admissibility and Scope of Defendant's Proposed Expert Testimony* [Doc. 62] is **GRANTED IN PART** and **DEFERRED IN PART**;

**IT IS FURTHER ORDERED** that the motion is granted with respect to any testimony that Dr. Reyes proposes to offer regarding the effects upon blood alcohol concentration of adrenaline, shock, and/or the infusion of intravenous fluids;

**IT IS FURTHER ORDERED** that the Court's ruling on the motion is **DEFERRED** with respect to any testimony that Dr. Reyes proposes to offer regarding the effects upon blood alcohol concentration of food in the stomach and historic tolerance for alcohol;

**IT IS FURTHER ORDERED** that the Court will grant to the Defendant an additional opportunity, outside the presence of the jury, to proffer through the testimony of Dr. Reyes, that Dr. Reyes's opinions and conclusions can be connected to the facts of this case.

**SO ORDERED** this 17th day of March, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge